**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:

    **STINSON PETROLEUM COMPANY, INC.,**         **CASE NO. 09-51663-NPO**

    **DEBTOR.**         **CHAPTER 7**


**DEREK A. HENDERSON, CHAPTER 7 TRUSTEE**         **PLAINTIFF**

**VS.**         **ADV. PROC. NO. 09-05094-NPO**

**COMMUNITY BANK, ELLISVILLE MISSISSIPPI**         **DEFENDANT**
**A/K/A COMMUNITY BANK**


**MEMORANDUM OPINION ON COMMUNITY BANK'S**
**FIRST SUPPLEMENTAL MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND THE TRUSTEE'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

There came on for consideration Community Bank's First Supplemental Motion for Partial

Summary Judgment (the "Motion") (Adv. Dkt. 56), Community Bank's First Supplemental

Memorandum in Support of Its Motion for Partial Summary Judgment ("Community Bank's Brief")

(Adv. Dkt. 57), and Community Bank's First Supplemental Listing of Material Facts that It Contends

Constitute Trustee's Burden to Establish a Prima Facie Case under Local Bankruptcy Rule 7056-1

(Part II) (Adv. Dkt. 58) filed by Community Bank, Ellisville, Mississippi a/k/a Community Bank

("Community Bank"); and the Trustee's Response in Opposition to Community Bank's

Supplemental Motion for Partial Summary Judgment (Adv. Dkt. 64), and the Trustee's Response

to Community Bank's Listing of Material Facts (Adv. Dkt. 62) filed by Derek A. Henderson,

Chapter 7 Trustee (the "Trustee") in the above-styled adversary proceeding (the "Adversary").  Also

for consideration were the Trustee's Cross-Motion for Partial Summary Judgment (the "Cross-

Motion") (Adv. Dkt. 65), the Trustee's Separate Listing of Material Facts (Adv. Dkt. 63), and the Trustee's Consolidated Memorandum in Support of Response in Opposition to Community Bank's Supplemental Motion for Partial Summary Judgment and Cross-Motion for Partial Summary Judgment (the "Trustee's Brief") (Adv. Dkt. 66) filed by the Trustee, Community Bank's Consolidated Rebuttal to its Supplemental Motion for Partial Summary Judgment and Response to Trustee's Cross-Motion for Partial Summary Judgment ("Community Bank's Rebuttal") (Adv. Dkt. 68), Community Bank's Memorandum in Support of its Consolidated Rebuttal to its Supplemental Motion for Partial Summary Judgment and Response to Trustee's Cross-Motion for Partial Summary Judgment ("Community Bank's Rebuttal Brief") (Adv. Dkt. 69), and Community Bank's Responses to Trustee's Separate Listing of Material Facts (Adv. Dkt. 70) filed by Community Bank; and Trustee's Reply in Support of Cross-Motion for Partial Summary Judgment (Adv. Dkt. 71) filed by the Trustee.

The Court also considered Community Bank's Surreply to Trustee's Reply in Support of Cross-Motion for Partial Summary Judgment (Adv. Dkt. 79) filed by Community Bank, and the Trustee Derek Henderson's Response in Opposition to Community Bank's Motion for Leave to File Surreply (Adv. Dkt. 75) filed by the Trustee. At a hearing held on February 7, 2011, the Court agreed to consider these additional submissions. See Order Granting Community Bank's Motion for Leave to File Surreply (Adv. Dkt. 78).

The Court, being fully advised in the premises, finds that the Motion should be granted in part and denied in part, and the Cross-Motion should be denied for the reasons specified herein.[1]

---

[1] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of

## Jurisdiction

This Court has jurisdiction over the parties to and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). Notice of the Motion and Cross-Motion was proper under the circumstances.

## Introduction

This Adversary arises out of a check-kiting scheme orchestrated by the Debtor, Stinson Petroleum Company, Inc. (the "Debtor"), and presents legal issues arising from the interplay between Article 4 of the Uniform Commercial Code (the "UCC") and federal banking regulations on the one hand, and the United States Bankruptcy Code on the other. Before addressing the facts of this Adversary, it is first necessary to discuss banking law and check-kiting in general.

The UCC regulates what a bank must do with a check once its customer deposits it for payment.[2] The first bank to take the check, the depositary bank, acts as its customer's agent in collecting the check from the bank on which it is drawn, known as the payor bank.[3] By midnight of its next banking day[4] after receipt of the check (the "Midnight Deadline"),[5] the payor bank must (1) pay the check, typically by failing to return it by its Midnight Deadline; (2) return the check for insufficient funds or some other reason; or (3) send notice of its intent not to pay the check, if the

_____

Bankruptcy Procedure 7052.

[2] Miss. Code Ann. § 75-4-101.

[3] Miss. Code Ann. §§ 75-4-105(3) (defining payor bank as the drawee of a draft).

[4] A banking day is defined as "the part of a day on which a bank is open to the public for carrying on substantially all of its banking functions." See Miss. Code Ann. § 75-4-104(a)(3).

[5] Miss. Code Ann. § 75-4-104(a)(10).

check is unavailable.[6]  If it fails to return the check or send notice of its intent not to pay the check before it has made final payment and before the Midnight Deadline, then a final payment of the check is deemed to have occurred, and the payor bank is obligated for the face amount of the check even if its customer's account is empty.

During the collection process, which may take days, the depositary bank usually records a provisional credit in the customer's account.[7]  The credit constitutes uncollected funds until such time as the payor bank pays or returns the check.  Because most deposited checks are collected, it is common for banks to allow customers to write checks drawn on uncollected funds, a practice viewed as necessary to facilitate the speedy utilization of funds in today's commerce.  See A. Brooke Overby, Allocation of Check Kiting Losses under the UCC, Regulation CC, and the Bankruptcy Code: Reconciling the Standards, 44 Wake Forest L. Rev. 59, 64 (Spring 2009).  Indeed, the UCC sanctions this practice.[8]  Moreover, Federal Reserve Regulation CC, which implements the Expedited Funds Availability Act ("EFAA"), 12 U.S.C. §§ 4001-4010, mandates that banks expedite the availability of deposits in many situations.[9]

---

[6] Miss. Code Ann.  § 75-4-215(a)(3) (an item is finally paid by a payor bank when it has "[m]ade a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearinghouse rule, or agreement").

[7] Miss. Code Ann. § 75-4-214(a) ("If a collecting bank has made a provisional settlement . . . and fails by reason of dishonor . . . to receive a settlement for the item . . . , the bank may revoke the settlement given by it, charge back the amount of any credit given for the item . . . , or obtain refund from its customer . . . .").

[8] Miss. Code Ann. § 75-4-201(a) ("before the time that a settlement given by a collecting bank for an item is or becomes final . . . any settlement given for the item is provisional").

[9] Regulation CC creates specific time frames for making funds available depending upon whether the check is local or non-local and whether the check exceeds $5000, among other factors. See 12 C.F.R. § 229.

Check kiting would not be possible if a bank allowed its customers to have access to funds from deposited checks only after the bank had received final payment for those checks.[10]  Check kiters depend on the use of provisional credit, which is the lynchpin of any successful check-kiting scheme.  Indeed, a kite crashes to the ground when the payor bank dishonors a check drawn on uncollected funds.

As described by the United States Supreme Court in Williams v. United States, 458 U.S. 279, 281 n.2 (1982), a check-kiting scheme begins when a check kiter opens an account at Bank *A* with a small deposit.  The check kiter then writes a check on his account at Bank *A* for a large sum of money, such as $50,000, and uses that check to open an account at Bank *B*.  At the time of the deposit, the account at Bank *A* does not have sufficient funds to cover the large check, but Bank *B* is unaware of this fact because of the "float" time, that is, the delay between the time the check kiter deposited the $50,000 check and the time Bank *A* must pay or return it for insufficient funds or for some other reason.  Bank *B* extends provisional credit to the check kiter, allowing the check kiter to write a $50,000 check on the account at Bank *B* and to present it to Bank *A* for payment. Likewise, Bank *A* extends provisional credit to the check kiter and pays the $50,000 check when Bank *B* presents it to Bank *A* for payment.  By repeating the above scheme, a check kiter enjoys the use of an artificially inflated account balance, so long as he is able to keep the deposited checks "floating" in the collection process.

## Facts

1.     This Adversary concerns a check-kiting scheme in its simplest form.  The Debtor shuttled worthless checks between its account at Community Bank in Ellisville, Mississippi (the "CB

_____

[10] See Overby, supra, at 64-65.

Account"), and its account at the Bank of Evergreen in Evergreen, Alabama (the "BOE Account").

2. The kite collapsed when Tim Dantz ("Dantz"), vice-president of Bank of Evergreen, discovered the scheme and placed a five-day hold on the availability of $3,296,600 deposited in the BOE Account, which consisted of the following five (5) checks drawn on the CB Account:

| Community Bank ("CB") Check Number | Amount |
|---|---|
| CB 1636 | $500,000 |
| CB 1640 | $696,404 |
| CB 1646 | $618,080 |
| CB 1651 | $689,740 |
| CB 1657 | $592,376 |

See Ex. D to Cross-Motion (Adv. Dkt. 65-4). The parties dispute whether these events took place on Thursday, July 2, 2009, or Monday, July 6, 2009.

3. Bank of Evergreen was closed on Friday, July 3, 2009, because of the Independence Day holiday on Saturday, July 4, 2009, but Community Bank was not. The parties dispute whether Friday, July 3, 2009, was a business day for purposes of the check collection process. Compare 5 U.S.C. § 6103(b) (establishing that for federal employees, the Friday immediately before a legal public holiday is deemed holiday when it occurs on a Saturday) with Regulation CC, 12 C.F.R. 229.2 (establishing only that if July 4 falls on a Sunday, the next Monday is not a business day).

4. When Bank of Evergreen re-opened on Monday, July 6, 2009, after being closed the previous Friday, it placed a five-day hold on $3,940,161 deposited in the BOE Account on that same day, consisting of the following five (5) checks drawn on the CB Account:

| CB Check Number | Amount |
|---|---|
| CB 1643 | $505,025 |
| CB 1650 | $806,346 |
| CB 1655 | $818,400 |

|           |           |
|-----------|-----------|
| CB 1661   | $673,132  |
| CB 1668   | $887,258  |

See Ex. E to Cross-Motion (Adv. Dkt. 65-5).

5.      The next day, Tuesday, July 7, 2009, Bank of Evergreen placed a five-day hold on $2,115,001 deposited in the BOE Account, including the following four (4) checks drawn on the CB Account:[11]

| CB Check Number | Amount    |
|-----------------|-----------|
| CB 1644         | $450,000  |
| CB 1652         | $535,219  |
| CB 1658         | $506,780  |
| CB 1665         | $478,002  |

See Ex. F to Cross-Motion (Adv. Dkt. 65-6).

6.      During the time the holds were in place, the Trustee contends that Bank of Evergreen dishonored all checks presented for payment against these uncollected deposits in the BOE Account. Community Bank disputes this contention.  It is undisputed, however, that Bank of Evergreen returned to Community Bank for insufficient funds eighteen (18) checks in the aggregate amount of $10,178,452, all of which the Debtor had previously deposited into the CB Account.

7.      The first seven (7) of the eighteen (18) checks returned by Bank of Evergreen were deposited on Tuesday, June 30, 2009, and Thursday, July 2, 2009.  Because of the Midnight Deadline, these seven (7) checks require closer review.

8.      The Debtor deposited three (3) checks into the CB Account on Tuesday, June 30, 2009, as follows:

---

[11] These deposits included a check in the amount of $150,000 drawn on an account at a different bank.

Bank of Evergreen ("BOE")

| Check Number | Amount |
|---|---|
| BOE 2231 | $780,733 |
| BOE 2229 | $745,360 |
| BOE 2226 | $466,770 |

See Dep. of Darron Thomas Dodd, Ex. A to Motion (Adv. Dkt. 56-1). The Trustee points to the electronic endorsement printed on the reverse side of the checks in support of his contention that these checks were presented through the Federal Reserve to Bank of Evergreen for payment on Thursday, July 2. Community Bank disputes this evidence.

9.     The Debtor deposited another four (4) checks into the CB Account on July 2, 2009, as follows:

| BOE Check Number | Amount |
|---|---|
| BOE 2243 | $722,683 |
| BOE 2240 | $703,892 |
| BOE 2242 | $414,930 |
| BOE 2237 | $289,600 |

See Dep. of Darron Thomas Dodd, Ex. A to Motion (Adv. Dkt. 56-1). Community Bank likewise disputes the evidence relied upon by the Trustee, consisting of the electronic endorsement printed on the reverse side of the checks, for his contention that these checks were presented through the Federal Reserve to Bank of Evergreen for payment on Monday, July 6, 2009.

10.     Bank of Evergreen dishonored all seven (7) checks on Monday, July 6, 2009. The parties dispute whether Bank of Evergreen returned the checks before the Midnight Deadline.

11.     Before Community Bank learned that Bank of Evergreen had returned the checks for insufficient funds, Community Bank had granted the Debtor provisional credits for the uncollected deposits, which the Debtor withdrew by writing checks drawn on the CB Account.

12.     After Community Bank learned that Bank of Evergreen had returned the checks for insufficient funds, Community Bank took several steps to minimize its risk of loss.  First, Community Bank placed a hold on the CB Account on July 7, 2009, and charged back all of the returned checks from the Bank of Evergreen, resulting in an overdraft balance of $6,155,070.68.

13.     Next, Community Bank returned to Bank of Evergreen nine (9) checks totaling $5,600,162 for insufficient funds which the Debtor had deposited into the BOE Account on July 6 and July 7, 2009.  Community Bank, however, did not return five (5) checks totaling $3,096,600, which the Debtor had previously deposited into the BOE Account on July 2, 2009.

14.     Because Bank of Evergreen had already placed five-day holds upon all of these deposits, the return of the nine (9) checks did not negatively impact Bank of Evergreen.

15.     Community Bank then filed late return claims ("Late Return Claims") against Bank of Evergreen with the Federal Reserve on the ground that Bank of Evergreen did not return the first seven (7) checks of the eighteen (18) checks in a timely manner.  Community Bank claimed that Friday, July 3, 2009, was a business day under federal banking regulations, and, therefore, the Midnight Deadline expired on that date and not on Monday, July 6, 2009.  If Community Bank's Late Return Claims succeeded, Bank of Evergreen could be held liable for the full, face amount of these seven (7) checks.

16.     Community Bank contacted Sam Stinson, a principal of the Debtor, and informed him about the hold placed on the CB Account.  A meeting was arranged to take place on Thursday, July 9, 2009, between Darron Thomas Dodd ("Dodd"), the senior vice-president for the Laurel, Mississippi, branch of Community Bank, Dantz, and Sam Stinson.  The parties dispute whether the meeting was arranged by Sam Stinson or Community Bank.  The parties agree that the purpose of

the meeting was to determine the cash position of the BOE Account, but disagree about whether an additional purpose was for Community Bank to convince Bank of Evergreen and Sam Stinson to wire money immediately to the CB Account. The parties agree that Dantz and Dodd discussed Community Bank's Late Return Claims and the fact that a hold on the BOE Account was scheduled for release the next day on Friday, July 10, 2009.

17.    As a result of the meeting on July 9, 2010, the parties concluded that only approximately $5.6 million in collected funds remained in the BOE Account. Sam Stinson and Leon Stinson, another principal of the Debtor, authorized Bank of Evergreen to wire transfer these remaining funds to the CB Account.

18.    In the meantime, Bank of Evergreen responded to the Federal Reserve's notice of Community Bank's Late Return Claims. Bank of Evergreen denied the claims on the ground that Bank of Evergreen was closed on Friday, July 3, 2009, and, therefore, the returns on Monday, July 6, 2009, were timely. See Ex. H. to Cross-Motion (Adv. Dkt. 65-8).

19.    Thereafter, Bank of Evergreen determined that because of a miscalculation, only $3,524,761.92 remained in the BOE Account.

20.    Bank of Evergreen agreed to process the proposed wire transfer on the condition that Community Bank execute an agreement releasing Bank of Evergreen from any liability arising out of Community Bank's Late Return Claims. The effective date of the settlement agreement (the "Settlement Agreement") was July 10, 2009. The parties dispute whether this date was selected intentionally to coincide with the date that the first hold expired on the BOE Account, which was also July 10, 2009. See Ex. J to Cross-Motion (Adv. Dkt. 65-10).

21.    The parties dispute the relevancy of the Settlement Agreement. The Trustee

maintains that the following three provisions in the Settlement Agreement are relevant to the preference issue:

> 1.      Community [Bank] agrees as follows:
>
> (a)      Agreement Not to Return Checks.  Community [Bank] agrees that it shall not return any checks drawn prior to July 10, 2009 on Community [Bank] in respect of [the Debtor] and deposited to Accounts maintained at [Bank of] Evergreen except checks already returned . . . . The Account at Community [Bank] is now restricted in anticipation of being closed, however the restriction herein shall not apply to checks drawn after July 10, 2009.
>
> (b)      Release of Disputed Claim. Community [Bank] agrees to drop any claim in respect of timeliness of return of checks in respect of the Accounts.
>
> *  *  *
>
> 2.      [Bank of] Evergreen agrees as follows:
>
> (a)      Payment in Consideration of the Foregoing. In consideration of the foregoing undertakings by Community [Bank], [Bank of] Evergreen agrees to immediately wire to Community [Bank] the sum of Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00), deposited to the account of [the Debtor] to partially cover overdrafts, together with any other collected funds in excess of funds necessary to cover payroll, that may come into the Account through Tuesday, July 14, 2009, in excess all as previously authorized by [the Debtor] on July 9, 2009.

See Ex. J to Cross-Motion at 1-2 (Adv. Dkt. 65-10).  Community Bank contends that the Settlement Agreement is wholly irrelevant to the preference claim.  Notably, the Debtor did not sign the Settlement Agreement.

22.      After deciding to keep approximately $24,000 in the BOE Account to cover payroll expenses, Sam Stinson and Leon Stinson executed written instructions to transfer an even $3.5 million from the BOE Account to the CB Account.  These two wire transfers, executed on July 10, 2009, form the centerpiece of the Trustee's preference claim.[12]

---

[12] The two wire transfers were necessary because no one at Bank of Evergreen had the authority to transfer more than $2 million in any single transaction.  Hereinafter, these separate wire transfers will be referred to collectively as the "Wire Transfers."

23.     The first wire transfer, in the amount of $1,992,863, included the following notation in the written instructions: "Payment for checks returned 2226, 2231, 2229," which refers to the first three (3) checks of the seven (7) checks that Community Bank had contested as having been returned untimely.  See Dep. of Tim Dantz, Ex. C to Motion (Adv. Dkt. 56-3).  The notation was made by Dantz, and the amount of the first wire transfer was equal to the amount of the first three checks. The parties dispute the significance of this notation, given that it was made by Bank of Evergreen but the written instructions were signed by the Debtor.

24.     The second wire transfer, in the amount of $1,507,137, included the following notation on the written instructions also made by Dantz: "Payment for checks returned."  See Dep. of Tim Dantz, Ex. C to Motion (Adv. Dkt. 56-3).  The parties also dispute the significance of this notation.

25.      Regardless of the Settlement Agreement, Bank of Evergreen would have released the hold on the BOE Account on July 10, 2009, as to the deposits totaling $3,296,600, at which point these funds in the BOE Account would have become available for withdrawal and payment of checks in the normal collection process.

26.     After the Wire Transfers, the CB Account was left with a remaining overdraft of $3,993,053.40.

27.     Notwithstanding the overdraft balance in its checking account, Community Bank agreed to allow the Debtor to keep the CB Account open for the purpose of purchasing fuel, an arrangement that Community Bank believed was necessary in order for the Debtor to remain in business.  From July 14, 2009, through July 21, 2009, the Debtor deposited $843,610.93 (the "Deposits") into the CB Account. The Debtor used the Deposits to pay for its fuel purchases.

Community Bank did not apply any portion of the Deposits to the overdraft balance in the CB Account.

28.     On July 20, 2009, the Debtor executed a promissory note in favor of Community Bank in the amount of $4,000,966, with a ten-day maturity date of July 30, 2009.  The Debtor also entered into a Forbearance Agreement with Community Bank in which the Debtor pledged certain real and personal property to secure payment of the note.  Although these liens are challenged as preferences in the Adversary, they are not the subject either of the Motion or the Cross-Motion presently before the Court.

29.     On July 21, 2009, the Debtor deposited $4 million of the loan proceeds into the CB Account to satisfy the remaining overdraft.

30.     The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 4, 2009 (the "Petition") (Bankr. Dkt.1).

31.     A committee of unsecured creditors was appointed by the United States Trustee for Region 5 on September 11, 2009 (Bankr. Dkt. 126), and a reconstituted creditors' committee (the "Committee") was appointed on October 9, 2009 (Bankr. Dkt. 219).

32.     On November 24, 2009, the Committee filed the Complaint (the "Complaint") (Adv. Dkt. 1) against Community Bank seeking to avoid under the preference statute, 11 U.S.C. § 547, three groups of transfers made during the ninety (90) days before the Debtor filed the Petition: (a) the Wire Transfers, (b) the Deposits, and (c) the liens that the Debtor granted Community Bank in the Forbearance Agreement. The Committee also seeks recovery of the transfers from Community Bank under 11 U.S.C. § 550(a)(1)-(2).  The Motion addresses avoidance of the first two groups of transfers, the Wire Transfers and the Deposits, as well as the recovery of those transfers; the Cross-

Motion addresses the avoidance of only the first group of transfers, the Wire Transfers.

33.     On December 16, 2009, the Debtor's chapter 11 bankruptcy case was converted to a chapter 7 case (Bankr. Dkt. 482), and the Trustee was appointed (Bankr. Dkt. 485).

34.     The Trustee was substituted for the Committee as the plaintiff in this Adversary on January 20, 2010 (Adv. Dkt. 8).

35.     On November 9, 2010, Community Bank filed the Motion seeking partial summary judgment in its favor on the Trustee's preference claims under 11 U.S.C. §§ 547(b), 550 as to the Wire Transfers and the Deposits.  The Motion supersedes and replaces the Motion for Partial Summary Judgment (Adv. Dkt. 20) previously filed by Community Bank on May 17, 2010. Conversely, the Trustee filed the Cross-Motion on December 2, 2010, seeking partial summary judgment in his favor on the ground that the Wire Transfers are avoidable as preferential transfers.

36.     In the interim, the Trustee sought and obtained several extensions of the response deadline in order to engage in certain discovery (Adv. Dkt. 28, 42, 47 & 55).

### Discussion

The Trustee has withdrawn his preference claim as to the Deposits.[13]  Thus, the only legal issue before the Court is whether the Wire Transfers that Community Bank applied to the negative collected balance in the CB Account–created from the provisional credits Community Bank extended the Debtor–are avoidable as preferences under 11 U.S.C. § 547(b).

### A.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, summary judgment is appropriate when

---

[13] See Trustee's Brief at 3 n.2 ("[T]he Trustee agrees that the six (6) 'regular deposits' do not constitute avoidable preferences and withdraws any such claim for relief based thereon.").

viewing the evidence in the light most favorable to the nonmoving party, the pleadings, depositions,

answers to interrogatories, and admissions, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986); Celotex

Corp. v Catrett, 477 U.S. 317, 322-23 (1986).  Rule 56(e)(2) further provides, in relevant part:

> When a motion for summary judgment is properly made and supported, an opposing
> party may not rely merely on allegations or denials in its own pleading; rather, its
> response must – by affidavits or as otherwise provided in this rule – set out specific
> facts showing a genuine issue for trial.

Fed. R. Civ. P. 56(e)(2).

Thus, once the moving party has made its required showing, the nonmoving party must go

beyond the pleadings and by its own affidavits or by depositions, answers to interrogatories, and

admissions on file, designate specific facts to establish that there is a genuine issue for trial.  Celotex,

477 U.S. at 324.  Ultimately, the role of this Court is "not . . . to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477

U.S. at 249; see Hamilton v. Segue Software Inc., 232 F.3d 473, 477 (5th Cir. 2000).  When, as here,

both parties have filed motions for summary judgment, the Court must rule on each motion on an

individual and separate basis.  Shaw Constructors v. ICF Kaiser Engineers, Inc., 395 F.3d 533, 538-

39 n.8 (5th Cir. 2004).

**B.     11 U.S.C. § 547**

The Trustee must establish the basic elements of a preference before he may recover the Wire

Transfers under 11 U.S.C. § 550.  Section 547(b) defines an avoidable preference as a:

> transfer of an interest of the debtor in property—
>
> (1)     to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made–

 (A) on or within 90 days before the date of the filing of the petition; or

 (B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if–

 (A) the case were a case under chapter 7 of this title;

 (B) the transfer had not been made; and

 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

For purposes of its Motion, Community Bank assumes for the sake of argument that the Trustee can prove the first four elements set forth in 11 U.S.C. § 547(b) with regard to the Wire Transfers and asks the Court to award it partial summary judgment on the ground that the Trustee cannot overcome the "improvement in position test," which is the fifth element of 11 U.S.C. § 547(b). Specifically, Community Bank contends that the Trustee cannot prove that the Wire Transfers enabled Community Bank to receive more money during the preference period than it would have received if (1) the case were a chapter 7 case, (2) the Wire Transfers had not been made, and (3) Community Bank had received payment on its claims against the Debtor for the dishonored checks as provided for in the Bankruptcy Code. 11 U.S.C. § 547(b)(5). The reason why the Trustee

cannot prove the fifth element, according to Community Bank, is because Community Bank had a security interest in the returned checks and all of their proceeds pursuant to Miss. Code Ann. § 75-4-210[14] and because liquidation of a fully secured debt does not deplete the assets of a debtor's estate.

Although the Trustee concedes that § 4-210 protects a depository bank to the extent it advances credit on uncollected deposits, he disputes any connection between Community Bank's realization on its security interest in the kited checks and the Wire Transfers because of the intervening Settlement Agreement between Community Bank and Bank of Evergreen. The Trustee claims that Community Bank failed to obtain payment of the dishonored checks "through the ordinary course" of the bank collection process and for this reason did not satisfy its security interest in the returned checks under Article 4.[15] Before discussing the Trustee's contentions any further, the Court must first consider Community Bank's argument in greater detail. While doing so, the Court will keep in mind the questions raised by the Trustee.[16]

### 1.    Community Bank's Argument

Under § 4-210, a bank that gives value for a check automatically obtains a perfected security

---

[14] Article 4 of the Mississippi UCC provides the final payment/accountability rule applicable to checks in the check collection process. Hereinafter, all references to the UCC are to the Mississippi UCC, located in Title 75 of the Mississippi Code Annotated beginning with Miss. Code Ann. § 75-1-101. Further citations to the UCC will omit the reference to Title 75. The parties do not dispute that Mississippi law applies in determining whether the Wire Transfers constitute proceeds of Community Bank's security interest in the dishonored checks. See Miss. Code Ann. § 75-4-102.

[15] Throughout the Trustee's Brief, the Trustee reiterates Community Bank's failure to "follow the process called for by the UCC of re-presenting the checks for payment through the ordinary course," Trustee's Brief at 17, to follow the "ordinary process of presentment and forward collection of checks," id. at 24, and to "re-present[ ] the checks through the Federal Reserve or through some other manner," id. at 26.

[16] The defense in 11 U.S.C. § 547(c) that applies to transfers made in the ordinary course of business is not at issue in this Adversary.

interest in that check and its proceeds, as follows:

> (a)    A collecting bank has a security interest in an item and any accompanying documents or the proceeds of either:

>> (1)    In case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;

>> (2)    In case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given, whether or not the credit is drawn upon or there is a right of charge-back; or

>> (3)    If it makes an advance on or against the item.

> * * *

> (c)    Receipt by a collecting bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents, and proceeds. So long as the bank does not receive final settlement for the item or give up possession of the item or possession or control of the accompanying documents for purposes other than collection, the security interest continues to that extent and is subject to Title 75, Chapter 9, but:

>> (1)    No security agreement is necessary to make the security interest enforceable (Section 75-9-203(b)(3)(A));

>> (2)    No filing is required to perfect the security interest; and

>> (3)    The security interest has priority over conflicting perfected security interests in the item, accompanying documents, or proceeds.

Miss. Code Ann. § 75-4-210 (Supp. 2010). Community Bank maintains that when it granted the Debtor provisional credit for the uncollected deposits, it received a security interest in the kited checks that continued until that security interest was satisfied by the Wire Transfers. Because of the security interest, the Wire Transfers did not alter the position Community Bank would assume in a hypothetical chapter 7 case, and, accordingly, the fifth element of 11 U.S.C. § 547(b) cannot be met. See Braniff Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d 1030, 1034 (5th Cir. 1987) (pre-petition payments to a fully secured creditor are not preferential because they do not enable the creditor to receive more than what he would have received in a chapter 7 liquidation).

Community Bank argues that almost every court that has addressed the secured status of a depositary bank and a check-kiting scheme under Article 4 of the UCC has held that a 11 U.S.C. § 547 preference claim fails as a matter of law. Community Bank relies principally upon the following three cases, none of which this Court is required to view as binding authority: First Tennessee Bank v. Stevenson (In re Cannon), 237 F.3d 716 (6th Cir. 2001); Laws v. United Missouri Bank of Kansas City, 98 F.3d 1047, 1051 (8th Cir. 1996); and Howell v. Bank of Newnan (In re Summit Financial Services, Inc.), 240 B.R. 105 (Bankr. N.D. Ga. 1999).

### a.    **Cannon**

In Cannon, the Sixth Circuit reversed the district court's holding that First Tennessee Bank's security interest in certain bounced checks "was in nothing more than 'valueless paper checks,'" based upon its construction of the Tennessee Uniform Commercial Code, Tenn. Code Ann. § 47-4-210, which is similar to the Mississippi UCC. Cannon, 237 F.3d at 719. The check-kiting scheme in Cannon primarily involved First Tennessee Bank, the depositary bank, and Hibernia Bank, the payor bank. The debtor drew two checks on his account at Hibernia Bank and deposited them into his accounts at First Tennessee Bank, which then granted the debtor provisional credits for the deposits. After Hibernia Bank returned the checks to First Tennessee Bank for insufficient funds, the debtor transferred money directly into his accounts at First Tennessee Bank, rather than in his account at Hibernia Bank, to cover the overdraft. These transfers took place on the same day First Tennessee Bank became aware of the checks–outside of its automated payments systems–and without any intervention by First Tennessee Bank.

The check-kiting scheme in Cannon collapsed when First Tennessee Bank closed all of the debtor's accounts. The chapter 7 trustee filed suit against First Tennessee Bank to avoid the transfers

made by the debtor to satisfy the overdraft. The district court agreed with the trustee that First Tennessee Bank had a security interest in the kited checks but held that its security interest was in nothing more than "valueless paper checks" because of the insufficiency of funds in the debtor's account at Hibernia Bank.

In reversing the district court, the Sixth Circuit held as a preliminary matter that the kited checks were worth their face value during the float period. "For the period during which First Tennessee [Bank] extended a provisional credit to [the debtor], the kited checks are worth every penny of their face value. [The debtor] exercised effective control over 'cash' money equivalent to the face value of the checks." Cannon, 237 F.3d at 721. The Sixth Circuit then concluded that because the challenged deposits satisfied First Tennessee Bank's security interest, they were not preferences under 11 U.S.C. § 547(b)(5). In reaching this conclusion, the Sixth Circuit rejected the trustee's contention that First Tennessee Bank's security interest did not reach funds that originated from a source other than from Hibernia Bank (as the payor bank) through the bank collection process. The Sixth Circuit explained that "once [the debtor] entered bankruptcy, First Tennessee [Bank] would be entitled to obtain the funds as a secured creditor, regardless of their location, up to the value of the checks" and that "[t]he security interest granted by Article 4 is designed to cover situations where the deposited check is ultimately dishonored by the drawee institution by giving the depositor bank an expansive security interest." Cannon, 237 F.3d at 721.

### b.   Laws

In Laws, a leading case on the application of the "improvement in position" test and Article 4 of the UCC, United Missouri Bank of Kansas City ("UMB") routinely paid the debtor's checks drawn against uncollected funds. Laws, 98 F.3d at 1048. The Eighth Circuit described how the bank

collection process provides an opportunity for check kiting, as follows:

> The ability to write checks against provisional credits gives the shrewd bank customer free use of someone else's money.  Viewed charitably, this is called aggressive cash management.  It also gives the dishonest customer a chance to write checks against non-existent deposits.  When done systematically and fraudulently, prosecutors call this criminal check kiting.

Laws, 98 F.3d at 1048.  The debtor's account ballooned to a negative collected balance of $4 million after the debtor began to decline financially.  When UMB advised the debtor that it would no longer pay the uncollected deposits, even though no checks had yet been returned for insufficient funds, the debtor borrowed $4 million from another bank and wired the loan proceeds to its account at UMB, eliminating its negative collected balance.  Shortly thereafter, the debtor commenced a chapter 11 bankruptcy case.  The trustee challenged the $4 million wire transfer as a preferential transfer.

Before it considered whether the wire transfer improved UMB's position, the Eighth Circuit in Laws agreed with UMB that "routine" provisional credit does not give rise to an antecedent debt for preference purposes.  The Eighth Circuit next considered the district court's finding that the $4 million wire transfer was not preferential because it did not improve UMB's position.  The Eighth Circuit reasoned that UMB had a security interest in the deposited checks and the provisional credits underlying the negative collected balance "to the extent to which credit given for the [check] has been withdrawn or applied" under the Missouri Uniform Commercial Code, Mo. Rev. Stat. § 400.4-210, a provision identical to the Mississippi UCC.  Laws, 98 F.3d at 1052. No preferential transfer occurred, even if it was on account of an antecedent debt, because UMB did not improve its fully secured position when it accepted the wire transfer.

> Because the bank's security interest in the check and its proceeds was released when the provisional credit was repaid . . . the estate was not depleted and no preferential transfer occurred.  Whether a provisional credit is construed as a loan secured by the check, or simply as too "provisional" to be treated as debt for bankruptcy purposes,

it cannot properly serve as the basis for preference liability.

Laws, 98 F.3d at 1052 (quoting Bernstein v. Alpha Assocs., Inc. (In re Frigitemp Corp.), 34 B.R. 1000,1015-16 (S.D.N.Y. 1983)). UMB's security interest in the dishonored checks was realized when the debtor repaid the provisional credit, and there was no preferential effect as required by 11 U.S.C. § 547(b)(5).

### c.    Summit Financial

The bankruptcy court addressed a similar check-kiting scheme in Summit Financial. There, the debtors used multiple accounts at The Bank of Newnan ("Newnan Bank") and First Citizens Bank to kite checks totaling millions of dollars. Summit Financial, 240 B.R. at 119. Newnan Bank had provisionally credited the debtors' accounts for all deposits made until the day it learned about the scheme. The kite collapsed after both banks stopped honoring the debtors' checks. The chapter 7 trustee sought to set aside as preferences three deposits made by the debtors to their checking accounts at Newnan Bank–two of which were made after Newnan Bank had learned about the check-kiting scheme. The bankruptcy court granted summary judgment in favor of Newnan Bank on the ground that Newnan Bank had a security interest in the deposited items to the extent that the debtors applied or made draws against the provisional credit pursuant to the Georgia Uniform Commercial Code, Ga. Code Ann. § 11-4-210, a provision similar to the Mississippi UCC. Summit Financial, 240 B.R. at 119. The bankruptcy court found Laws persuasive and gave short shrift to the argument that the bank's security interest had no value because the kited checks were worthless:

> That the deposited items at issue here were kited checks matters not. As such, the Court must reject the Trustee's position that Newnan Bank's security interest lacked value because the kited checks were worthless. A deposit is not worthless if it is honored by the drawee bank. Clearly, both banks in this check kite treated the [d]ebtors' deposits as though they had value. During the kite, Newnan Bank and First Citizens [Bank], in conformance with a nationwide banking practice, voluntarily

extended dollar for dollar credit to the [d]ebtors immediately upon receipt of deposits. In other words, the kited checks were treated like hard currency. Now, two years after the kite collapsed, the Trustee and First Citizens [Bank] claim that those same checks and deposits had no value.

Summit Financial, 240 B.R. at 119.

### 2.   Trustee's Argument

As noted previously, although the Trustee admits the existence of Community Bank's security interest, he disputes any connection between enforcement of that interest and the Wire Transfers. The issue in this Adversary, according to the Trustee, is not whether Community Bank had an Article 4 security interest in the kited checks but whether the Wire Transfers satisfied that interest. The Trustee answers the question affirmatively because of the process–or lack of process–used by Community Bank to obtain the funds. The Trustee contends that Community Bank "contrived a dispute with Bank of Evergreen over 'late returns' which in turn set into motion the chain of events that resulted in the settlement agreement." Trustee's Brief at 20. As proof that the dispute was "contrived," the Trustee insists that Community Bank's position that the return of the kited checks was untimely was dubious because Bank of Evergreen dishonored the checks by the Midnight Deadline. In short, the Trustee argues that the Wire Transfers constituted proceeds of the Settlement Agreement between Community Bank and Bank of Evergreen and not of the proceeds of the kited checks because Community Bank abandoned its security interest when it decided not to re-present the checks through the Federal Reserve to Bank of Evergreen for payment in the "ordinary" check collection process but to pursue Late Return Claims against Bank of Evergreen.

The Trustee claims that Cannon, Laws, and Summit Financial are factually distinguishable because they were reached only after a finding that the bank in question had acted within the "ordinary course" and without knowledge of the check-kiting scheme and further claims that these

cases incorrectly broaden the scope of the security interest provided for in § 4-210. In Cannon, for example, the debtor transferred money to cover the overdrafts in his account at First Tennessee, whereas here, according to the Trustee, the Wire Transfers did not "serve to satisfy" Community Bank's security interest but rather the terms of its Settlement Agreement with Bank of Evergreen. In this way, the Settlement Agreement itself constituted a preferential transaction. The Trustee similarly argues that Laws is factually distinguishable because UMB realized its security interest in the kited checks when the debtor wired loan proceeds into its account covering those checks. The Trustee likewise contends that Summit Financial does not apply because unlike Newnan Bank, Community Bank did not receive direct proceeds on the kited checks through the ordinary process of presentment and forward collection of checks. Finally, the Trustee distinguishes all three cases on the ground that those banks acted without knowledge of the check-kiting scheme.

### a.   **GMAC**

For his contention that "the bank's security interest is limited to the item and to any funds directly exchanged for that same item," the Trustee relies upon General Motors Acceptance Corp. v. Union Bank & Trust Co., 329 F.3d 594 (8th Cir. 2003), a non-bankruptcy case decided by the same court that previously decided Laws. Trustee's Brief at 25. In GMAC, an automobile dealership (the "Dealership") deposited fifteen (15) checks into its account at Union Bank & Trust Co. ("Union Bank"), which then provided immediate credit and allowed it to withdraw the uncollected funds. Twelve (12) of the checks, totaling $335,345.29, were returned to Union Bank after the maker of the checks had stopped payment. The Dealership had insufficient funds to cover the returned checks. Instead of charging back the returned checks and creating an overdraft in the Dealership's account, Union Bank entered the amount of the dishonored checks as a debit to its own

general ledger cash items account.

Thereafter, the Dealership sold several vehicles that it owned through financing provided by GMAC and deposited sales proceeds of $246,500 into its account. These vehicles and the proceeds from the sales of these vehicles were subject to GMAC's perfected security interest. Union Bank recorded the deposit in its general ledger cash items account. The deposit fell short of the amount of the dishonored checks, and Union Bank charged back the deficit to the Dealership's account. At the Dealership's request, Union Bank returned the twelve (12) dishonored checks to the Dealership, and the Dealership closed its account there.

GMAC sued Union Bank on the ground that it converted $246,500 of its collateral proceeds. Relying on Cannon, the district court held that Union Bank had an Article 4 security interest in the checks under § 4-210(a)(1), which was superior to GMAC's Article 9 security interest. The Eighth Circuit agreed with the district court that "[s]o long as Union [Bank] did not receive final settlement for the 12 dishonored checks or give up their possession, it retained a security interest in the 12 checks with priority over conflicting security interests." GMAC, 329 F.3d at 598 (citing § 4-210(c)). The Eighth Circuit, however, disagreed with the district court in its adoption of Cannon's holding that the Article 4 security interest is "expansive" and attaches to any funds emanating from any transaction or any source. The Eighth Circuit began its analysis by limiting the definition of "proceeds" of a check under § 4-210(c) only to funds collected or exchanged for that same check. Thus, once the third party stopped payment on the twelve (12) checks, Union Bank could not realize its security interest through the bank collection process but could satisfy its security interest only (1) by exchanging the dishonored checks with the Dealership or the payor bank for money or other value or (2) by charging back the dishonored checks to the Dealership's account. Union Bank never

acquired a security interest in the dishonored checks because it did not perform either of these steps. Indeed, Union Bank returned the dishonored checks to the Dealership. The deposits consisting of the sales proceeds were a separate transaction, made on a separate date, consisting of separate checks collected from separate sources. Therefore, Union Bank's rights were subordinate to GMAC's perfected Article 9 security interest. The Eighth Circuit distinguished its earlier opinion in Laws in a footnote as follows:

> In Laws v. United Mo. Bank, 98 F.3d 1047, 1049-52 (8th Cir. 1996), our court was presented with a similarly distinguishable case involving preferences under the Bankruptcy Code and an on-going check kiting scheme. We addressed an antecedent debt issue and recognized "deposited checks in an on-going check kite are not worthless, though some may be dishonored if the kite collapses." We now address a direct presentment to the drawee bank and competing security interests.

GMAC, 329 F.3d at 597. The Trustee maintains that GMAC supports the proposition that an Article 4 security interest does not grant a blanket security interest in all assets of its customer, and that the Wire Transfers did not satisfy Community Bank's security interest because they did not occur within the ordinary course of business envisioned by the UCC.

In making this argument, the Trustee rejects the notion that the destination of the funds determines whether there has been a direct exchange for a check. Rather, he claims that this determination is made by examining the ordinary check collection process and, according to the Trustee, there was nothing ordinary about the means Community Bank employed to obtain the Wire Transfers. Indeed, without the Settlement Agreement, Community Bank would have had to stand in line with the rest of the Debtor's other unsecured creditors.

### b.    Montgomery

In addition to GMAC, the Trustee relies upon McLemore v. Third National Bank in Nashville

(In re Montgomery), 983 F.2d 1389 (6th Cir. 1993), where a bank's knowledge of, and perhaps, participation in, the check-kiting scheme was deemed relevant.   As such, the Trustee contends that Montgomery provides strong support for his preference claim.   In Montgomery, the debtor kited checks in accounts at Third National Bank and in accounts at other banks.   With knowledge that the debtor was kiting checks and prior to the debtor's satisfaction of the overdrafts in his accounts, Third National Bank engaged in several negotiations with the debtor, the result of which was the implementation of a system that prevented further withdrawals but allowed new deposits into the debtor's accounts until the overdraft was eliminated through kited checks against other banks.   The trustee sought to recover as preferential transfers nearly $2 million in deposits used by Third National Bank to offset its overdraft exposure.   The bankruptcy court ruled in favor of the trustee, holding that the overdraft due to the check-kiting scheme constituted an antecedent debt for preference purposes.   On appeal, the district court affirmed.   On further appeal, the Sixth Circuit agreed with the district court that the funds created by the kited checks at other banks constituted "an interest of the debtor in property" within the meaning of 11 U.S.C. § 547(b). In that regard, the Sixth Circuit observed:

> [I]t seems to us that the debtors' estate was depleted here when the debtors elected to use the proceeds of unauthorized loans obtained from other banks to discharge their indebtedness to Third National [Bank].   The assets obtained by kiting checks [at other banks] were clearly in [the debtor's] control, and his use of such assets to grease the squeaky wheel at Third National [Bank] constituted a preferential transfer.

Montgomery, 98 F.3d at 1396.

The Trustee likens the situation in Montgomery to the facts presented here and in doing so, adopts the interpretation of Montgomery provided by the bankruptcy court in Emerson v. Federal Savings Bank (In re Brown), 209 B.R. 874 (Bankr. W.D. Tenn. 1997), as follows:

> [W]hen a collecting bank acts in its normal course to collect deposited items, the collection satisfies the security interest in the deposit item. Under the facts of Montgomery, the transactions satisfying antecedent debt were not normal bank collection activity, and avoidance of the transfers to the bank was justified.

Id. at 884-85. Likewise, the Trustee relies upon the Sixth Circuit's discussion of Montgomery in Cannon:

> [W]hile Montgomery provides guidance for situations where the depositary or collecting bank acts with knowledge of the kiting scheme, it does not control situations such as the case at bar where the bank acts in the ordinary course of business, without knowledge of questionable banking practices by its account holder.

Cannon, 237 F.3d at 720. According to the Trustee, both Community Bank and Third National Bank in Montgomery acted with knowledge of the check-kiting scheme in a manner that was outside of the "ordinary course" of normal banking activities in order to shift kite losses to others.

### 3.    Community Bank's Reply

Community Bank contends that the Settlement Agreement is irrelevant because "[i]t follows, as the night follows the day"[17] that the Wire Transfers paid for the kited checks, as evidenced by the notations included on the authorizations for the Wire Transfers.[18] Community Bank's Brief at 4. According to Community Bank, the machinations behind the Wire Transfers make no difference because in the end the proceeds were used to pay the dishonored checks. On this point, Community Bank agrees with the Trustee that its assertion of claims against both the Debtor and Bank of Evergreen arose out of the same dishonored checks but insists that its claims were not mutually exclusive. It also contends that its Late Return Claims raised a valid dispute and in no way resulted

---

[17] "To thine own self be true, and it must follow, as the night the day, thou canst not then be false to any man." Hamlet, Act 1, sc. iii.

[18] The Trustee gives no evidentiary weight to these notations because they were written by Bank of Evergreen, not by Community Bank and not by the Debtor. Community Bank pointed out, however, that the wiring instructions were signed by the Debtor.

in an abandonment of its security interest in the checks because the filing of its Late Return Claims with the Federal Reserve was not "[r]eceipt by a collecting bank of a final settlement." Miss. Code Ann. § 75-4-210(c). Also, Community Bank points out that regardless of whether the Wire Transfers emanated from the Settlement Agreement, Bank of Evergreen certainly did not transfer any of its own money and had no authority to transfer any of the Debtor's money without the Debtor's authorization.

Community Bank distinguishes GMAC on the ground that Community Bank, unlike Union Bank, charged back the dishonored checks to the CB Account. Also, there was no overdraft balance in the Dealership's account, and Union Bank relinquished possession of the returned checks. Next, Community Bank distinguishes Montgomery on the ground there is no evidence that Community Bank knew about the check-kiting scheme while it was on-going, that it had private meetings with the Debtor, or that it knowingly benefitted from the check-kiting scheme, all of which occurred in Montgomery. Indeed, according to Community Bank, the facts in Montgomery showed that Third National Bank became a collaborator with the debtor in shifting its check-kiting losses to other banks, but here Community Bank itself was the victim. More important, Community Bank maintains that Third National Bank's security interest under § 4-210 was never addressed in Montgomery, a fact that led the Sixth Circuit in Cannon to conclude: "Nor does Montgomery offer any guidance on the question of a bank's state law security interest." Cannon, 237 F.3d at 720.

Community Bank also disagrees with the Trustee's assertion that Laws and Summit Financial "acknowledge[d] the correctness" of the decision in Montgomery. Trustee's Reply Brief at 5. Although the Eighth Circuit in Laws stated it agreed with the result reached in Montgomery, it also stated that it disagreed with "broad language in the opinions in that case." Laws, 98 F.3d at 1051

n.4.  According to Community Bank, these statements were made in the context of the Eighth Circuit's holding that "routine advances against uncollected deposits do not create a 'debt' to the bank." Id. at 1051.  Also, Community Bank maintains that the bankruptcy court in Summit Financial found Montgomery "easily distinguishable" because (1) it contained no discussion of a bank's security interest in kited checks, a conclusion shared by the Cannon court, and (2) because it invoked the egregious act of one bank shifting kites to other banks.  Summit Financial, 240 B.R. at 108. Community Bank points out that in Laws, UMB's deliberate action to reverse its overdraft exposure did not adversely impact its security interest, and similarly, in Summit Financial, Newnan Bank's knowledge of the kite before the purported preferential transfers did not adversely impact its security interest.

Finally, in opposition to the Cross-Motion, Community Bank argues that at least $3,096,600[19] in the BOE Account consisted of kited proceeds from the Debtor's use of provisional credits granted by Community Bank.  These funds were "in law and equity, the property of Community Bank, and held by the [D]ebtor in constructive trust."  See Community Bank's Rebuttal Brief at 25 n.22.  In support of its argument, Community Bank cites Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111 (5th Cir. 1995), where the Fifth Circuit held that when a debtor holds legal title to property in constructive trust for another, then the funds "generally are not deemed an asset of the debtor's estate for preference purposes." Id. at 1117.

---

[19] Community Bank calculated the $3,096,600 figure by ignoring each entry in the BOE Account that was later reversed or negated by dishonored checks or deposits and by tracing the deposits in the BOE Account from July 2, 2009, when it showed a positive balance, until July 10, 2009, the date of the Wire Transfers.  See Aff. of Darron Dodd, Ex. C to Community Bank's Rebuttal.  The Trustee disputes this calculation.

### C.    Summary Judgment Standard Not Met

In determining whether the standard for summary judgment has been met, this Court must consider the Motion and Cross-Motion independently.  Notably, the filing of opposing motions for summary judgment does not require the Court to grant either party's motion if the Court finds a genuine issue of material fact.  Schlytter v. Baker, 580 F.2d 848, 849 (5th Cir. 1978).  Finally, the Court notes that even when the technical requirements of summary judgment have been met, it has the discretion to determine whether "a better course would be to proceed to a full trial."  Kunin v. Feofanov, 69 F.3d 59, 62 (5th Cir. 1995); Black v. J.I. Case Co., 22 F.3d 568, 572 (5th Cir. 1994); Veillon v. Exploration Servs., Inc., 876 F.2d 1197, 1200 (5th Cir. 1989).

### 1.    Motion

Viewing the evidence in a light most favorable to the Trustee, the Court finds that Community Bank has not met its burden of demonstrating the lack of a genuine issue of material fact.  It is clear from the cases cited by Community Bank that a bank's security interest in kited checks may be realized from sources paid outside the "ordinary" bank collection process. For example, the Sixth Circuit in Cannon held that First Tennessee Bank satisfied its security interest even though the overdrafts in the debtor's accounts at First Tennessee Bank were not paid through the "making good" of the kited checks by Hibernia Bank but through deposits made by the debtor into the accounts.  Cannon, 237 F.3d at 721; see Laws, 98 F.3d at 1048 (debtor wired loan proceeds to his account at UMB); Summit Financial, 240 B.R. at 119 (debtors made three (3) deposits into their accounts at Newnan Bank).  Thus, the undisputed fact that Community Bank's security interest was not satisfied by re-presentment of the kited checks through the "ordinary" bank collection process is immaterial.

It is also clear to the Court that the Trustee's reliance on GMAC is misplaced.  That decision was dictated by the extraordinary way Union Bank chose to account for the returned checks.  Here, however, it is undisputed that Community Bank, unlike Union Bank, charged back the kited checks in the ordinary bank collection process, and as a result, Community Bank had a security interest in the kited checks.

The Trustee's opposition to the Motion is better served by his reliance on Montgomery because it renders relevant Community Bank's conduct after it became aware of the Debtor's check-kiting scheme.  Although Community Bank's conduct does not mirror the egregious conduct described in Montgomery, it also does not reflect the passive roles of First Tennessee Bank in Cannon, Newnan Bank in Summit Financial, or UMB Bank in Laws.  As previously discussed, First Tennessee Bank became aware of the kite the same day the transfers occurred and did not participate in the transfers.  Cannon, 237 F.3d at 721.  Newnan Bank knew about the kite before the transfers occurred but did not arrange for the deposits or wire transfers.  Summit Financial, 240 B.R. at 110.  UMB knew about the uncollected deposits but did not arrange for the $4 million loan that eliminated the debtor's negative collected funds balance.  Laws, 98 F.3d at 1049.  None of the cases cited by Community Bank in support of the Motion presents a factual situation like the one presented here where Community Bank played an active role in obtaining payment of the kited checks after the kite ended but did not collaborate with the Debtor during the kite.  The Trustee's allegation that Community Bank satisfied its security interest solely as a result of the Settlement Agreement between Community Bank and Bank of Evergreen adds another wrinkle that further distinguishes this Adversary from Cannon, Laws, and Summit Financial.

The events and circumstances surrounding Community Bank's handling of the kited checks

after it learned about the kite raises genuine issues of material fact as to whether the Wire Transfers satisfied Community Bank's security interest in the kited checks.  Consideration of this legal issue requires the Court to resolve a multitude of factual issues, such as:  Was there a valid dispute regarding the timeliness of Bank of Evergreen's return of the checks to Community Bank?[20]  Was Friday, July 3, 2009, a banking holiday?[21]  When were the first seven (7) checks returned by Bank of Evergreen presented to Bank of Evergreen for payment?[22]  Who arranged for the meeting that took place at Bank of Evergreen on July 9, 2009?[23]  Was the date of the meeting on July 9, 2009, set intentionally to coincide with the date the first hold on the BOE Account expired?[24]  Was the purpose of the meeting on July 9, 2009, to convince Bank of Evergreen and Sam Stinson to wire money immediately to the CB Account?[25]  Did Community Bank persuade Sam Stinson to wire the funds?[26]  Why was the Settlement Agreement necessary?[27]  What is the significance of the notations on the wiring instructions?[28]   The role of this Court when confronted by a summary judgment motion is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249; see Hamilton, 232 F.3d at 477.  Given the

---

[20] See supra ¶ 10, at 8.

[21] See supra ¶ 3, at 6.

[22] See supra ¶¶ 8-9, at 7-8.

[23] See supra ¶ 16, at 9-10.

[24] See supra ¶ 21, at 10-11.

[25] See supra ¶ 16, at 9-10.

[26] See supra ¶ 22, at 11.

[27] See supra ¶¶ 21, at 10-11.

[28] See supra ¶¶ 23-24, at 12.

multitude of disputed, material facts, Community Bank is asking this Court to do exactly that. These disputed facts can only be resolved by a trial on the merits.

### 2.   Cross-Motion

Viewing the evidence in a light most favorable to Community Bank, the Court also finds that the Trustee has not met his burden of showing the lack of a genuine issue of material fact. The Court finds that Community Bank's handling of the dishonored checks raises genuine issues of material fact for the reasons discussed previously. In addition, the Court finds that Community Bank has raised a genuine issue of material fact as to whether the Wire Transfers, in whole or in part, constituted property of the Debtor's estate, a threshold requirement of the Trustee's preference claim.[29]   See, e.g., Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 21 (1995) (holding that debtor's property interest in bank account consisted of his contractual rights with depositary bank).

### Conclusion

Accordingly, the Court concludes that the Motion should be granted in part and denied in part. As to the Deposits, the Trustee concedes that Community Bank is entitled to partial summary judgment.[30]   As to the Wire Transfers, the Court finds that there are disputed issues of material fact and concludes that Community Bank is not entitled to partial summary judgment as a matter of law. The Court further concludes that the Cross-Motion should be denied. The Court finds that there are disputed issues of material fact that preclude the entry of partial summary judgment in favor of the

---

[29] In connection with the Motion, Community Bank assumed that the Wire Transfers were property of the Debtor's estate but did not concede the issue for purposes of the Cross-Motion.

[30] See supra note 13.

Trustee.[31]

 A separate final judgment will be entered in accordance with Federal Rule of Bankruptcy

Procedure 9021.

 SO ORDERED.

_____

Neil P. Olack
United States Bankruptcy Judge


April 12, 2011

---

 [31] A status conference will be set for determining what issues remain to be tried and for scheduling any further proceedings that may be appropriate**.**