## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

| | |
|---|---|
| **STINSON PETROLEUM COMPANY, INC.,** | **CASE NO. 09-51663-NPO** |
| **DEBTOR.** | **CHAPTER 7** |

| | |
|---|---|
| **DEREK A. HENDERSON, CHAPTER 7 TRUSTEE** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 09-05094-NPO** |
| **COMMUNITY BANK, ELLISVILLE MISSISSIPPI**<br>**A/K/A COMMUNITY BANK** | **DEFENDANT** |

## MEMORANDUM OPINION ON COMPLAINT TO AVOID AND RECOVER PREFERENTIAL TRANSFERS AND TO RECOVER POST PETITION TRANSFERS

On August 22-24, 2011, there came on for trial (the "Trial") the Complaint to Avoid and Recover Preferential Transfers and to Recover Post Petition Transfers (the "Complaint") (Adv. Dkt. 1) filed by Derek A. Henderson, Chapter 7 Trustee (the "Trustee"),[1] and Community Bank's Answer to Complaint to Avoid and Recover Preferential Transfers and to Recover Post Petition Transfers (Adv. Dkt. 17) filed by Community Bank, Ellisville, Mississippi a/k/a Community Bank ("Community Bank") in the above-referenced adversary proceeding (the "Adversary"). At the Trial, Derek A. Henderson, W. Thomas McCraney, III, and Douglas C. Noble represented the Trustee, and John A. Crawford, Jr. and Jeff D. Rawlings represented Community Bank. The Court, being fully advised in the premises, finds that the wire transfers that the Trustee seeks to recover in this

---

[1] The Complaint was originally filed by the Unsecured Creditors' Committee, but the Trustee was substituted as the plaintiff after the chapter 11 bankruptcy case was converted to a chapter 7 case. (Adv. Dkt. 8).

Adversary are not preferences under 11 U.S.C. § 547 and that such relief should be denied for the reasons specified herein.[2]

### Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this Adversary pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).  Notice of the Trial was proper under the circumstances.

### Facts

In the First Amended Pretrial Order (the "Pretrial Order") (Adv. Dkt. 99), the parties stipulated to the following facts, to which the Court has made minor stylistic changes:

1.      Stinson Petroleum Company, Inc. (the "Debtor") engaged in a substantial check-kiting scheme before filing a voluntary petition for relief on August 4, 2009, under chapter 11 of the United States Bankruptcy Code in Case No. 09-51663-NPO.

2.      In July, 2009, the Debtor maintained a checking account with Community Bank (primary account  no. xxxxxxx224) (the "CB Account") and a checking account with the Bank of Evergreen (account no. xxxxxxx532) (the "BOE Account").

3.      Bank of Evergreen was closed and not open to the public on Friday, July 3, 2009, because of the Independence Day holiday on Saturday, July 4, 2009.  Community Bank remained open on July 3, 2009, because the Federal Reserve was open on that day.

4.      Before the holiday weekend, Bank of Evergreen vice-president Tim Dantz ("Dantz")

---

[2] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052.

had become suspicious of kiting activity in the Debtor's BOE Account.

5.      When Bank of Evergreen re-opened on Monday, July 6, 2009, after having been closed for business the previous Friday, Dantz confirmed that the Debtor was kiting checks between the CB Account and the BOE Account.

6.      The kite collapsed on Monday, July 6, 2009, when Dantz placed a five-day hold on the availability of $3,940,161.00 deposited in the BOE Account that day as well as $3,296,600.00 previously deposited in the BOE Account on Thursday, July 2, 2009. (P Exs. 7-8).[3]

7.      The deposits on July 2 and July 6, 2009, into the BOE Account included the following checks drawn on the CB Account:

July 2, 2009:

Community Bank ("CB")

| Check Number | Amount |
| --- | --- |
| CB 1636 | $500,000 |
| CB 1640 | $696,404 |
| CB 1646 | $618,080 |
| CB 1651 | $689,740 |
| CB 1657 | $592,376 |

July 6, 2009:

| CB Check Number | Amount |
| --- | --- |
| CB 1643 | $505,025 |
| CB 1650 | $806,346 |
| CB 1655 | $818,400 |
| CB 1661 | $673,132 |
| CB 1668 | $887,258 |

---

[3] The Trustee's exhibits from the Trial are cited as "P Ex. ____", and the joint trial exhibits from the Trial are cited as "JT Ex. ____".

The deposit made on July 2, 2009, also included a check in the amount of $200,000.00 drawn on an account at a different bank.  The deposit made on July 6, 2009, also included a check in the amount of $250,000.00 drawn on an account at a different bank.

8.      The next day, Tuesday, July 7, 2009, Bank of Evergreen placed a five-day hold on $2,115,001.00 deposited in the BOE Account, including the following four (4) checks drawn on the CB Account:

| CB Check Number | Amount |
| --- | --- |
| CB 1644 | $450,000 |
| CB 1652 | $535,219 |
| CB 1658 | $506,780 |
| CB 1665 | $478,002 |

The deposit included a check in the amount of $150,000.00 drawn on an account at a different bank.

9.      The holds were put into place by Bank of Evergreen so that the deposited checks could be electronically processed for forward collection and payment through the Federal Reserve to the payor banks.  While the holds were in place, the Debtor did not have access to the funds through the use of provisional credits, and checks that were presented for payment on the BOE Account were rejected for insufficient funds and returned unpaid.

10.      Over several days beginning on July 6, 2009, Bank of Evergreen refused to honor eighteen (18) checks totaling $10,178,452.00 drawn on the Debtor's BOE Account that the Debtor had deposited into its CB Account.  After these checks were deposited into the CB Account, Community Bank processed them for forward collection and payment.  Community Bank made a digital image of the checks and electronically transmitted them through the Federal Reserve for presentment to the Bank of Evergreen. Those checks, with their check numbers, amounts and the dates the checks were deposited by the Debtor into the CB Account are as follows:

Bank of Evergreen ("BOE")

| Check Number | Amount | Date of Deposit |
|---|---|---|
| BOE 2226 | $466,770 | June 30, 2009 |
| BOE 2229 | $745,360 | June 30, 2009 |
| BOE 2231 | $780,733 | June 30, 2009 |
| BOE 2237 | $289,600 | July 2, 2009 |
| BOE 2242 | $414,930 | July 2, 2009 |
| BOE 2240 | $703,892 | July 2, 2009 |
| BOE 2243 | $722,683 | July 2, 2009 |
| BOE 2238 | $310,580 | July 3, 2009 |
| BOE 2241 | $603,244 | July 3, 2009 |
| BOE 2234 | $425,000 | July 3, 2009 |
| BOE 2244 | $706,200 | July 3, 2009 |
| BOE 2248 | $706,096 | July 3, 2009 |
| BOE 2235 | $306,988 | July 6, 2009 |
| BOE 2245 | $347,300 | July 6, 2009 |
| BOE 2239 | $704,610 | July 6, 2009 |
| BOE 2247 | $767,014 | July 6, 2009 |
| BOE 2246 | $340,000 | July 7, 2009 |
| BOE 2250 | $783,452 | July 7, 2009 |

11.    For each of the eighteen (18) checks (the total of which is $10,178,452.00), Community Bank had provided the Debtor with provisional credits for the uncollected deposits, and the Debtor availed itself of those provisional credits.

12.    The Debtor deposited three (3) of the eighteen (18) checks into the CB Account on Tuesday, June 30, 2009, as follows:

| BOE Check Number | Amount |
|---|---|
| BOE 2231 | $780,733 |
| BOE 2229 | $745,360 |
| BOE 2226 | $466,770 |

13.    The electronic endorsements on the reverse side of these returned items sets forth that these checks were originally presented for payment through the Federal Reserve to the Bank of Evergreen on Thursday, July 2, 2009.

14.     The Debtor deposited another four (4) checks into the CB Account on July 2, 2009, as follows:

| BOE Check Number | Amount |
|---|---|
| BOE  2243 | $722,683 |
| BOE  2240 | $703,892 |
| BOE  2242 | $414,930 |
| BOE  2237 | $289,600 |

The electronic endorsements on the reverse side of these returned items set forth that these checks were originally presented through the Federal Reserve to the Bank of Evergreen on Monday, July 6, 2009.

15.     Bank of Evergreen dishonored the three June 20, 2009, checks on Monday, July 6, 2009, when it reopened following the holiday weekend.  Community Bank received advance notification of the returns later that same day.  The June 30 checks/images were returned by the Federal Reserve to Community Bank on July 7, 2009.  Bank of Evergreen dishonored the four July 2 checks on July 7, 2009.  The July 2, 2009, checks/images were returned by the Federal Reserve to Community Bank on July 8, 2009.  Community Bank realized that the Debtor was kiting checks on July 6, 2009, when it received notification that Bank of Evergreen was in the process of returning large items.

16.     Before Community Bank learned that Bank of Evergreen had returned the checks for insufficient funds, Community Bank had granted the Debtor provisional credits for the uncollected deposits, which the Debtor withdrew by writing checks drawn on the CB Account.

17.     Upon giving the Debtor use of the provisional credits, Community Bank received a duly perfected first priority security interest in the eighteen (18) checks and the proceeds thereof, pursuant to the Uniform Commercial Code ("UCC").

18.     Community Bank charged back each of the eighteen (18) checks to the Debtor's CB Account.  As of July 9, 2009, after Community Bank charged back the returned checks from Bank of Evergreen, the Debtor's CB Account was overdrawn by $6,155,070.68.

19.     Community Bank also returned to Bank of Evergreen nine (9) checks totaling $5,600,162.00 for insufficient funds which the Debtor had deposited into the BOE Account on July 6 and July 7, 2009.  Because Bank of Evergreen had already placed five-day holds upon all of these deposits, the return of the nine (9) checks did not negatively impact Bank of Evergreen.

20.     Community Bank also filed late return claims ("Late Return Claims") with the Federal Reserve on the ground that Bank of Evergreen did not return the first seven (7) checks of the eighteen (18) checks in a timely manner.  If the returns were, in fact, untimely, then Bank of Evergreen, in addition to the Debtor, would also be liable for paying the checks.

21.     Bank of Evergreen disputed Community Bank's Late Return Claims.

22.     On Thursday, July 9, 2009, Sam Stinson, a principal of the Debtor; Darron Dodd ("Dodd"), then president of Community Bank; Dantz; and the president of the Bank of Evergreen had a meeting at the Bank of Evergreen in Evergreen, Alabama.  The purpose of the meeting was to determine the cash position of the BOE Account.

23.     As a result of the meeting on July 9, 2009, the parties concluded that only approximately $5.6 million in collected funds would be available in the BOE Account.  Sam Stinson and Leon Stinson, another principal of the Debtor, authorized Bank of Evergreen to wire transfer available funds to the CB Account.

24.     Thereafter, Bank of Evergreen determined that because of a miscalculation, only $3,524,761.92 remained in the BOE Account.

25.     The first hold on the BOE Account was scheduled for release on July 10, 2009, regarding the deposits totaling $3,296,600.00.

26.     Bank of Evergreen agreed to process the proposed wire transfer on the condition that Community Bank execute an agreement releasing Bank of Evergreen from any liability arising out of Community Bank's Late Return Claims.  The effective date of the Settlement Agreement and Release of Claims (the "Settlement Agreement") was July 10, 2009. (JT Ex. 8).

27.     The Settlement Agreement provides in pertinent part:

1.     Community [Bank] agrees as follows:

(a)     <u>Agreement Not to Return Checks</u>.  Community [Bank] agrees that it shall not return any checks drawn prior to July 10, 2009, on Community [Bank] in respect of [the Debtor] and deposited to Accounts maintained at [Bank of] Evergreen except checks already returned . . . . The Account at Community [Bank] is now restricted in anticipation of being closed, however, the restriction herein shall not apply to checks drawn after July 1, 2009.

(b)     <u>Release of Disputed Claim</u>.  Community [Bank] agrees to drop any claim in respect of timeliness of return of checks in respect of the Accounts.

* * *

2.     [Bank of] Evergreen agrees as follows:

(a) <u>Payment in Consideration of the Foregoing</u>.  In consideration of the foregoing undertakings by Community [Bank], [Bank of] Evergreen agrees to immediately wire to Community [Bank] the sum of Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00), deposited to the account of [the Debtor] to partially cover overdrafts, together with any other collected funds in excess of funds necessary to cover payroll, that may come into the Account through Tuesday, July 14, 2009, in excess all as previously authorized by [the Debtor] on July 9, 2009.

(JT Ex. 8).

28.     The Debtor did not sign the Settlement Agreement.

29.     After deciding to keep approximately $24,000.00 in the BOE Account to cover

payroll expenses, Sam Stinson and Leon Stinson executed written instructions to transfer an even $3.5 million from the BOE Account to the CB Account. The transfer was actually accomplished through two separate wires (the "Wire Transfers"), which were necessary because no one at Bank of Evergreen had the authority to transfer more than $2 million in any single transaction.

30.     The first wire transfer, in the amount of $1,992,863.00, included the following notation in the written instructions: "payment for checks #2226, 2231 and 2229," which refers to the first three (3) checks of the seven (7) checks that Community Bank had contested as having been returned untimely. The amount of the first wire transfer was equal to the amount of the first three (3) checks. (JT Ex. 9).

31.     The second wire transfer, in the amount of $1,507,137.00, included the following notation on the written instructions: "Payment for returned checks." (JT Ex. 9).

32.     Afer the Wire Transfers, the CB Account was left with a remaining overdraft of $3,993,053.40.

33.     Bank of Evergreen disputed Community Bank's Late Return Claims and filed their responses on July 13, and July 14, 2009.

34.     The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 4, 2009 (Case No. 09-51663-NPO, Dkt. 1).

35.     The Wire Transfers from the Debtor's BOE Account to the Debtor's CB Account were within the 90-day preference period.

36.     Community Bank was a creditor of the Debtor and the Wire Transfers were for Community Bank's benefit.

37.     The Wire Transfers were made after the collapse of the Debtor's check-kiting scheme.

38.     The Debtor's overdraft liability to Community Bank constitutes an "antecedent debt."

39.     At the time of the Wire Transfers, the Debtor was insolvent.

**Procedural History**

In the Memorandum Opinion on Community Bank's First Supplemental Motion for Partial Summary Judgment and the Trustee's Cross-Motion for Partial Summary Judgment ("Summary Judgment Opinion") (Adv. Dkt. 80), the Court applied the undisputed facts to the relevant federal and state law and: (1) granted in part and denied in part Community Bank's First Supplemental Motion for Summary Judgment (Adv. Dkt. 56) and (2) denied the Trustee's Cross-Motion for Partial Summary Judgment (Adv. Dkt. 65). The Court granted summary judgment in favor of Community Bank as to the Trustee's preference claim regarding deposits made by the Debtor into the CB Account from July 14, 2009, through July 21, 2009, in the total amount of $843,610.98. The Court denied all other relief on the ground that Community Bank's conduct after it learned about the Debtor's check-kiting scheme raised genuine issues of material fact for trial, such as: Was there a valid dispute regarding the timeliness of Bank of Evergreen's return of the checks to Community Bank? Was Friday, July 3, 2009, a banking holiday? When were the first seven (7) checks returned by Bank of Evergreen presented to Bank of Evergreen for payment? Who arranged for the meeting that took place at Bank of Evergreen on July 9, 2009? Was the date of the meeting on July 9, 2009, set intentionally to coincide with the date the first hold on the BOE Account expired? Was the purpose of the meeting on July 9, 2009, to convince Bank of Evergreen and Sam Stinson to wire money immediately to the CB Account? Did Community Bank persuade Sam Stinson to wire the funds? Why was the Settlement Agreement necessary? What is the significance of the notations on the wiring instructions?

On June 15, 2011, the parties entered into an Agreed Judgment of Dismissal as to Fewer than All Plaintiff's Claims (the "Agreed Judgment") (Adv. Dkt. 92).  In the Agreed Judgment, the parties agreed that all claims between them had been settled with the exception of the Trustee's preference claim regarding the Wire Transfers.  On August 18, 2011, the parties submitted the Pretrial Order. The Trial was held on August 22-24, 2011.

### Discussion

After entry of the Summary Judgment Opinion and Agreed Judgment, the only issue that remained for Trial was whether the Wire Transfers that Community Bank applied to the negative collected balance in the CB Account – created from the provisional credits Community Bank extended the Debtor – are avoidable as preferences under 11 U.S.C. § 547(b).

### A.      Burden of Proof

"For the purposes of [11 U.S.C. § 547], the trustee has the burden of proving the avoidability of a transfer under subsection (b) . . . and the creditor or party in interest against whom recovery or avoidance is sought has the burden of providing the non-avoidability of a transfer under subsection (c) of this section."  11 U.S.C. § 547(g).  Under 11 U.S.C. § 547(f), a debtor is presumed to have been insolvent on and during the ninety days preceding the date of the filing of the petition. Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp., 158 F.3d 312, 315 (5th Cir. 1998).

### B.      11 U.S.C. § 547

The Trustee must establish the basic elements of a preference before he may recover the Wire Transfers under 11 U.S.C. § 550.  Section 547(b) defines an avoidable preference as a:

transfer of an interest of the debtor in property—

(1)  to or for the benefit of a creditor;

(2)  for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3)  made while the debtor was insolvent;

(4)  made–

   (A)  on or within 90 days before the date of the filing of the petition; or

   (B)  between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5)  that enables such creditor to receive more than such creditor would receive if–

   (A)  the case were a case under chapter 7 of this title;

   (B)  the transfer had not been made; and

   (C)  such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  Section 547(b) serves two purposes.  First, it allows a trustee to avoid pre-bankruptcy transfers occurring on the eve of bankruptcy and discourages creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy."  Union Bank v. Wolas, 502 U.S. 151, 161 (1991).  Second, it ensures equal distribution among creditors.  Id.

Community Bank concedes that the Trustee can prove the first four elements of 11 U.S.C. § 547(b) but asserts that the Trustee cannot overcome the "improvement in position" test under 11 U.S.C. § 547(b)(5).  Specifically, Community Bank contends that the Trustee has not proved that the Wire Transfers enabled Community Bank to receive more money during the preference period than it would have received if (1) the case were a chapter 7 case, (2) the Wire Transfers had not been

made, and (3) Community Bank had received payment on its claims against the Debtor for the dishonored checks as provided for in the Bankruptcy Code. 11 U.S.C. § 547(b)(5). Community Bank claims that the failure to satisfy the fifth element of 11 U.S.C. § 547 prohibits the Trustee from recovering the Wire Transfers as preferences. Community Bank supports its claim by arguing (1) that it had a valid security interest in the returned checks and all of their proceeds pursuant to Miss. Code Ann. § 75-4-210,[4] and (2) that the liquidation of its fully secured claims does not deplete the Debtor's estate. *See, e.g.*, First Tenn. Bank v. Stevenson (In re Cannon), 237 F.3d 716 (6th Cir. 2001); Laws v. United Mo. Bank of Kansas City, 98 F.3d 1047 (8th Cir. 1996); Howell v. The Bank of Newnan (In re Summit Fin. Servs., Inc.), 240 B.R. 105 (Bankr. N.D. Ga. 1999).

Although the Trustee agrees that Miss. Code Ann. § 75-4-210 protects a depositary bank to the extent it advances credit on uncollected deposits, he disputes any connection between Community Bank's realization of its security interest in the kited checks and the Wire Transfers because of the intervening Settlement Agreement between Community Bank and Bank of Evergreen. *See, e.g.*, G.M.A.C. v. Union Bank & Trust Co., 329 F.3d 594 (8th Cir. 2003).

### C. Miss. Code Ann. § 75-4-210

Under Miss. Code Ann. § 75-4-210, a bank that gives value for a check automatically obtains a perfected security interest in the check and its proceeds, as follows:

> (a) A collecting bank has a security interest in an item and any accompanying documents or the proceeds of either:

---

[4] Article 4 of the Mississippi UCC provides the final payment/accountability rule applicable to checks in the check collection process. Hereinafter, all references to the UCC are to the Mississippi UCC, located in Title 75 of the Mississippi Code Annotated beginning with Miss. Code Ann. § 75-1-101. The parties do not dispute that Mississippi law applies in determining whether the Wire Transfers constitute proceeds of Community Bank's security interest in the dishonored checks. See Miss. Code Ann. § 75-4-102.

(1)     In case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;

(2)     In case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given, whether or not the credit is drawn upon or there is a right of charge-back; or

(3)     If it makes an advance on or against the item.

* * *

(c)     Receipt by a collecting bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents, and proceeds. So long as the bank does not receive final settlement for the item or give up possession of the item or possession or control of the accompanying documents for purposes other than collection, the security interest continues to that extent and is subject to Title 75, Chapter 9, but:

(1)     No security agreement is necessary to make the security interest enforceable (Section 75-9-203(b)(3)(A));

(2)     No filing is required to perfect the security interest; and

(3)     The security interest has priority over conflicting perfected security interests in the item, accompanying documents, or proceeds.

Miss. Code Ann. § 75-4-210 (Supp. 2010). When Community Bank granted the Debtor provisional credit for the uncollected deposits, Community Bank received a security interest in the kited checks. Neither party disputes that the money transferred via wire from the Bank of Evergreen to Community Bank belonged to the Debtor. Yet, the Trustee contends that the purpose of the Wire Transfers was for something other than the realization of Community Bank's security interest in the returned checks. The question thus posed by the Trustee is as follows: for a depository bank to realize its security interest in an item under Miss. Code Ann. § 75-4-210, does it matter that the overdraft was paid with the proceeds of a settlement regarding a dispute over the timeliness in which the payor bank had returned items for non-payment?

The Trustee asserts that the issue requires a comparison between normal bank collection

activity and the process employed by Community Bank to obtain the Wire Transfers.  The Trustee views Community Bank's conduct after it learned about the kite as less than ordinary.  To support its position, the Trustee relies heavily on McLemore v. Third National Bank in Nashville (In re Montgomery), 983 F.2d 1389 (6th Cir. 1993).

In Montgomery, the debtor kited checks in his accounts at Third National Bank and other banks.  With knowledge of the debtor's kite, Third National Bank negotiated with the debtor, resulting in an arrangement that prevented new withdrawals but permitted new deposits, until the debtor's overdraft was eliminated through kited checks against other banks. In an adversary proceeding against Third National Bank, the trustee recovered roughly $2 million as a voidable preference, which Third National Bank had collected to offset its overdraft exposure. Third National Bank did not argue that it had a security interest in the returned items.  The district court affirmed the bankruptcy court's decision on appeal.  On further appeal, the Sixth Circuit agreed that the overdraft due to the check-kiting scheme constituted an antecedent debt for preference purposes.

Here, the Trustee asks this Court to follow the interpretation of Montgomery provided by the bankruptcy court in Emerson v. Federal Savings Bank (In re Brown), 209 B.R. 874 (Bankr. W.D. Tenn. 1997), and, in particular, to embrace the relevance it placed on normal bank collection activity, as follows:

> [W]hen a collecting bank acts in its normal course to collect deposited items, the collection satisfies the security interest in the deposit item.  Under the facts of Montgomery, the transactions satisfying antecedent debt were not normal bank collection activity, and avoidance of the transfers to the bank was justified.

Id. at 884-85.  The Trustee also relies upon the Sixth Circuit's discussion of Montgomery in Cannon:

> [W]hile Montgomery provides guidance for situations where the depository or

collecting bank acts with knowledge of the kiting scheme, it does not control situations such as the case at bar where the bank acts in the ordinary course of business, without knowledge of questionable banking practices by its account holder.

Cannon, 237 F.3d at 720. According to the Trustee, both Community Bank and Third National Bank in Montgomery acted with knowledge of the check-kiting scheme in a manner that was outside of the "ordinary course" of normal banking activities in order to shift kite losses to others.

In light of the evidence presented at Trial, including the live testimony of Dodd, Jeannelle Berginnis ("Berginnis"), and Paul A. Carrubba ("Carrubba"), and the deposition testimony of Dantz, the Court concludes that the Wire Transfers are not avoidable as preferences. It is clear from the testimony of Dantz and Dodd, and from the notations on the wiring instructions, that the Wire Transfers actually reduced the overdraft in the CB Account. It is also clear that the conduct of Community Bank, after it discovered the kite, was not comparable to the conduct addressed in Montgomery. Therefore, it is unnecessary for this Court to make an Erie[5] guess as to whether Mississippi would apply an exception to the security interest granted by Miss. Code Ann. § 75-4-210, as discussed in Cannon and Brown.

The Court rejects the Trustee's contention that Community Bank, like Third National Bank in Montgomery, took control of the Debtor's kite. Dodd testified at Trial that it was Sam Stinson who set up the meeting with Dantz at the Bank of Evergreen and that before the meeting, Dodd had been convinced by Sam Stinson that the Debtor's BOE Account had enough funds to cover all of the returned checks. The purpose of their meeting with Dantz at the Bank of Evergreen was to determine the precise balance in the BOE Account and not so that Community Bank could pressure Sam Stinson to shift Community Bank's losses elsewhere. On their nearly three-hour car ride

---

[5] Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1930).

together to Evergreen, Alabama, their conversation was dominated by football, rather than bounced checks, according to Dodd.  Later, at the meeting with Dantz, it was Sam Stinson who insisted that the Bank of Evergreen transfer funds to the CB Account.

The Court finds nothing extraordinary about the meeting between Sam Stinson, Community Bank, and the Bank of Evergreen.  Indeed, Carrubba, Community Bank's expert witness in the field of bank operations, testified that such negotiations are common practice after the collapse of a check-kiting scheme.

The Trustee asserts that the Wire Transfers were proceeds of the Settlement Agreement and were not intended to satisfy Community Bank's security interest.  He contends that Bank of Evergreen would not have transferred any funds until Community Bank executed the Settlement Agreement resolving Community Bank's Late Return Claims.  Moreover, the Trustee insists that the Late Return Claims were part of Community Bank's machinations to take control of the BOE Account.  The Trustee, however, did not present evidence at Trial supporting his characterization of Community Bank's conduct after the kite.

Berginnis, a 40-year employee of Community Bank and its vice-president of operations, explained in detail the basis for her decision to make claims for payment against Bank of Evergreen on the seven checks.  She testified that because of internal bank policy, she had maybe one hour to make these decisions,[6] and did not know then, and had no reason to know then, that Bank of

---

[6] The UCC regulates what a bank must do with a check once its customer deposits it for payment.  Miss. Code Ann. § 75-4-101.  Under the UCC, a bank has until midnight of its next banking day after receipt of the check ("the Midnight Deadline") to either (1) pay the check in cash; (2) return the check for insufficient funds or another reason; or (3) send notice of its intent not to pay the check.  Miss. Code Ann. § 75-4-214.  If a bank fails to return a check or send notice of its intent not to pay before the Midnight Deadline, then a final payment is deemed to have occurred and the payor bank is obligated for the face amount of the check.  Miss. Code Ann. § 75-4-215.

Evergreen had closed at noon on Wednesday, July 1 and had closed all day on Friday, July 3 for Independence Day, which was not a Federal Reserve Bank holiday. Therefore, Berginnis reasonably believed that Bank of Evergreen untimely returned the checks deposited in the CB Account on June 30 and July 2. The testimony of Berginnis was supported by the testimony of Carrubba, who also testified that Community Bank acted reasonably in asserting the Late Return Claims based on the information available to Berginnis at that time. Carrubba further testified that the Late Return Claims constituted a form of re-presentment of the returned checks.

Undoubtedly, the Settlement Agreement between Community Bank and Bank of Evergreen was unusual in that it required Bank of Evergreen to wire to Community Bank any other collected funds deposited into the BOE Account through July 14. This Court, however, does not find this provision unusual enough to result in the forfeiture of Community Bank's security interest, especially given that no additional funds were actually deposited into the BOE Account.

### Conclusion

The Court concludes that Community Bank had a valid security interest in the returned checks under Miss. Code Ann. § 75-4-210, and the liquidation of Community Bank's fully secured claims did not deplete the Debtor's estate. Because of Community Bank's security interest, the Wire Transfers did not alter the position Community Bank would assume in a hypothetical chapter 7 case, and, accordingly, the fifth element of 11 U.S.C. § 547(b) cannot be met. Braniff Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d 1030, 1034 (5th Cir.1987) (pre-petition payments to a fully secured creditor are not preferential because they do not enable a creditor to receive more than he would have received in a chapter 7 liquidation). Therefore, because the Trustee has not satisfied the fifth element of 11 U.S.C. § 547(b), the Court concludes that the Wire Transfers are not avoidable as preferences.

In accordance with Rule 7058 of the Federal Rules of Bankruptcy Procedure, the Court will enter a separate final judgment consistent with this Memorandum Opinion.

SO ORDERED.

Neil P. Olack
United States Bankruptcy Judge
Dated:  September 14, 2011